IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS. | ) | Cr. No. 06-106-02S |
| | ) | |
| KHALID MASON | ) | |

GOVERNMENT'S TRIAL MEMORANDUM

I. The Indictment and Elements

The indictment charges KHALID MASON with conspiracy to distribute and possess with the intent to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. § 846 (Count I), possession with the intent to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2 (Count II), and maintaining drug involved premises in violation of 21 U.S.C. § 856 (Count III).

The elements of Count I are as follows:

First, that the conspiracy charged in the indictment existed between at least two people to distribute and possess with intent to distribute cocaine base; and,

Second, that the defendant willfully joined in that agreement.

If the jury finds the government proved each of the above two elements beyond a reasonable doubt, then they must answer the

following question:

How much cocaine base was involved in the conspiracy as a whole?

____ at least 50 grams of cocaine base

____ at least 5 grams of cocaine base

See Pattern Criminal Jury Instructions for the District Courts of the First Circuit, §§ 4.18.371 & 4.21.841(a)(1) Comment note 2; see also United States v. Ortiz, 447 F.3d 28, 37 and n.6 (1st Cir. 2006) (affirming the district court's charge asking the jury to determine the quantity of cocaine involved in the conspiracy as a whole).

The elements of Count II are as follows:

First, that defendant on or about January 16, 2004 possessed cocaine base, either actually or constructively;

Second, that he did so with a specific intent to distribute the cocaine base over which he had actual or constructive possession; and,

Third, that he did so knowingly and intentionally.

If the jury finds the government proved each of the above elements beyond a reasonable doubt, then the jury must answer the following question:

Did the offense involve 50 grams or more of cocaine base?

With respect to Count II, to establish aiding and abetting, the government must prove beyond a reasonable doubt:

First, that someone else committed the charged crime; and

Second, that defendant consciously shared the other person's knowledge of the underlying criminal act, intended to help him, and willfully took part in the endeavor, seeking to make it succeed.

See Pattern Criminal Jury Instructions for the District Courts of the First Circuit, § 4.18.02; United States v. Keene, 341 F.3d 78, 84 (1st Cir. 2003).

The elements of Count III are as follows:

First, that defendant on January 16, 2004 managed and controlled 214 Pavilion Avenue, 3rd Floor, Providence, Rhode Island;

Second, that he knowingly made 214 Pavilion Avenue, 3rd Floor, available for use to others; and

Third, that he made 214 Pavilion Avenue, 3rd Floor, available for the purpose of unlawfully manufacturing, storing or distributing cocaine base.

See United States v. Bilis, 170 F.3d 88, 92 (1st Cir. 1999).

## II. Factual Summary

The government expects the evidence in this case to show the

following:

After investigation, the Providence Police Department obtained search warrants for 214 Pavilion, 3rd Floor, Providence, RI and 85 Dunnell Avenue, 2nd Floor, Pawtucket, RI - the apartments of Khalid Mason and Derrick Isom. On January 16, 2004, the detectives with the narcotics division set up surveillance on 214 Pavilion Avenue. At approximately 4:20 p.m., they observed Isom leave the residence. Shortly thereafter, the detectives attempted to stop Isom, but he fled from the police. Isom then called Mason.

While executing the search warrants, the detectives discovered numerous items associated with narcotics trafficking. In the kitchen of 214 Pavilion, 3rd Floor, detectives found the following items: (1) a brown paper bag containing approximately 100 grams of crack cocaine located under the counter; (2) a pan and baggies; (3) additional boxes of baggies; (4) cut-off baggies; (5) a RI License Plate "Khalid;" (6) men's clothing; and (7) a scale.

In a bedroom of 214 Pavilion Avenue, 3rd Floor, detectives found the following items: (1) $2,360 in a Brooks bag; (2) paperwork and pictures of Khalid Mason; (3) a drug ledger; (4) plastic bags containing approximately 57 grams of crack within view on the floor of the bedroom closet; and (5) men's clothing.

In the attic stairway, detectives found a Brooks plastic bag

containing approximately 150 grams of crack cocaine.

All drug exhibits were sent to the laboratory where they were tested for cocaine base and weighed. The net weight of all drug exhibits is 303.91 grams, and all exhibits are cocaine base, "crack." The packaging material, along with several other items of evidence, were sent to the Bureau of Criminal Investigations for fingerprint analysis; however, no fingerprints were recovered.

During the execution of the search warrant at 85 Dunnell Avenue, detectives met with Malika Chinnery, the mother of Isom's children. In the front bedroom, inside Isom's jacket pocket, detectives found $9,551. In the back bedroom, detectives found personal paperwork belonging to Isom, a Nokia cell phone, photographs of Isom, a bill of sale for a BMW and keys. Officers also found men's clothing in the apartment.

Because Derrick Isom was a fugitive, detectives followed Erik Isom, Derrick Isom's brother. They followed him to a Ramada Inn in Massachusetts where detectives observed Derrick Isom enter his brother's vehicle. The vehicle was stopped and Derrick Isom was arrested. In his possession, he had $1,672 and a NEXTEL phone.

Upon learning about the raid on his apartment, Mason fled from the police. He remained a fugitive for nearly two years. During this period of time, Mason obtained false identification

in the name of Therry Denson to preclude law enforcement from locating him.

On October 5, 2006, deputies with the United States Marshal's Service found Mason living in Connecticut. Mason initially told Deputy U.S. Marshal (DUSM) Joe Murphy that his name was Therry Denson and he provided DUSM Murphy with false identification. DUSM Murphy asked the defendant to spell "Therry Denson," but Mason misspelled the name on his false identification card. Mason then admitted his true identity. He also admitted to DUSM Michael Wattik that he knew about the warrant for his arrest. He told DUSM Wattik that he did not think he would "beat the charges" and therefore he decided to flee.

## III. Legal Issues

### A. Fed.R.Evid. 404(b)

To the extent the evidence is not intrinsic to the offenses charged, the government intends to introduce evidence that the defendant was convicted in Providence County (Rhode Island) Superior Court (case number P2-1998-3726A) of manufacture and delivery of a controlled substance. The government may also introduce evidence that the defendant admitted he dealt drugs "in the past," including in the month leading up to January 16, 2004.

This evidence will be offered to prove the defendant's

knowledge, intent and motive to distribute the narcotics seized from his apartment. See United States v. Landrau-Lopez, 444 F.3d 19, 23-24 (1st Cir. 2006) (allowing testimony regarding the defendant's prior drug dealings with a witness to show knowledge and intent); United States v. Manning, 79 F.3d 212, 217 (1st Cir. 1996) ("[W]hen charges of drug trafficking are involved, this court has often upheld the admission of evidence of prior narcotics involvement to prove knowledge and intent."); United States v. Hadfield, 918 F.2d 987, 995 (1st Cir. 1990) (affirming the district court's decision to admit the defendants' prior drug convictions because such convictions were probative of knowledge, intent and the working relationship between defendants).

B. Opinion Evidence

The government will offer the testimony of law enforcement personnel, in particular TFA Robert Enright, TFA Joseph Colanduano, Detective Peter Conley, and Lieutenant Thomas Verdi, who may testify based upon their extensive experience and training in the field of drug trafficking, to the methods and operations unique to the narcotics business. The government may also elicit testimony about the techniques used by law enforcement in a narcotics investigation.

Based upon their extensive training and experience, the agents may testify to the manner in which "crack" cocaine is manufactured, transported, sold and used. The agents may testify

to the price of "crack" cocaine and what constitutes a distributable quantity of "crack" cocaine. The agents may testify that a "rock" of "crack" cocaine weighs approximately 0.2 grams and sells for $20. The agents may also testify that an ounce of "crack" cocaine sells for $800 - $1,200. From this information, the agents will testify to the retail and wholesale value of 303 grams of "crack" cocaine, and that the quantity of "crack" seized from the defendant's apartment is consistent with distribution. They may also testify to the retail and wholesale value of the individual quantities of "crack" cocaine seized from various locations within the defendant's apartment.

The agents may also testify to the equipment used in narcotics business, specifically, the use of scales, ledgers, cellular phones, money and packaging material. They will testify as to how the equipment is used and the advantages provided to drug dealers by the use of such equipment. In particular, they may testify that drug ledgers are a method of accounting for sales in the drug world and that it is not uncommon to seize such ledgers during the execution of a narcotics search warrant. The agents will also demonstrate how "crack" cocaine is packaged in baggies, and they will explain the significance of the numerous baggies without corners seized from 214 Pavilion, 3rd Floor.

The First Circuit has consistently upheld the introduction of this type of agent testimony. See United States v. Maher, 454

F.3d 13, 23-24 (1st Cir. 2006) (upholding the admission of agent testimony regarding the meaning of words and numbers used in "Post It" notes seized from the defendant's vehicle, and testimony regarding the typical packaging of narcotics); United States v. Ayala-Pizarro, 407 F.3d 25, 28-29 (1st Cir. 2005) (affirming the district court's decision to admit agent testimony regarding the packaging of narcotics and how drug points operate); United States v. Reynoso, 336 F.3d 46, 49 (1st Cir. 2003) (opinion that drug quantity was consistent with possession with intent to distribute); United States v. Villarman-Oviedo, 325 F.3d 1, 13 (1st Cir. 2003) (agent allowed to testify to meaning of code words); United States v. Rivera-Rosario, 300 F.3d 1, 17 (1st Cir. 2002) (coded drug phrases); United States v. Valle, 72 F.3d 210, 214-15 (1st Cir. 1995).

Experienced investigators may also be "permitted to testify as experts on topics such as the structure of a criminal enterprise, the economics of the drug trade, and the handling of contraband." United States v. Sepulveda, 15 F.3d 1161, 1183-84 (1st Cir. 1993); see United States v. Pinillos-Prieto, 419 F.3d 61, 71-72 (1st Cir. 2005) (allowing agent testimony regarding the dangerous nature of drug organizations and why organizational leaders as well as innocent observers are not present during the actual handoff of narcotics); United States v. Garcia-Morales, 382 F.3d 12, 18-19 (1st Cir. 2004) (agent permitted to testify

regarding the structure and operation of a typical drug conspiracy); United States v. DiMarzo, 80 F.3d 656, 659-60 (1st Cir. 1996) (allowing testimony that drug dealers do not take innocent observers to drug deals); United States v. Hensel, 699 F.2d 18, 38 (1st Cir.) (general practices of drug smugglers), cert. denied, 461 U.S. 958 (1983).

Likewise, agents may testify regarding the "tools of the trade" in the drug business. See, e.g., United States v. Alosa, 14 F.3d 693, 696-97 (1st Cir. 1994); United States v. Tejada, 886 F.2d 483, 486-87 (1st Cir. 1989); United States v. Allen, 269 F.3d 842, 846 (7th Cir. 2001) (allowing expert testimony regarding "'tools of the trade'"). In addition to testifying regarding the "tools of the trade," agents have been permitted to testify about the locations in which drug activity occurs. See United States v. Isler, 429 F.3d 19, 26-27 (1st Cir. 2005) (allowing agent testimony about the features of a drug house and that defendant's house was consistent with other drug houses); Ayala-Pizarro, 407 F.3d at 28-29 (allowing testimony regarding how drug points operate).

In this case, agents may testify about the use of drug ledgers in the narcotics business and that two of the items seized from the defendant's bedroom appear to be drug ledgers. Based upon their experience and training, Task Force Agent Joseph Colanduano or Lieutenant Thomas Verdi will explain and interpret

the drug ledgers seized. This type of testimony from an experienced narcotics officer has long been accepted by the First Circuit. See United States v. Echeverri, 982 F.2d 675, 680-81 (1st Cir. 1993) (accepting agent testimony explaining a drug ledger); Tejada, 886 F.2d at 486-87; see also United States v. Balthazard, 360 F.3d 309, 318 (1st Cir. 2004) (admitting notes seized during a search warrant).

C. Physical Evidence

Evidence of "tools of the trade" is admissible to prove the existence of a conspiracy as well as intent to distribute. See United States v. McGuire, 389 F.3d 225, 230 (1st Cir. 2004) (judgment vacated on other grounds) ("'in drug trafficking firearms have become 'tools of the trade' and thus are probative of the existence of a drug conspiracy'"); United States v. Ford, 22 F.3d 374, 383 (1st Cir. 1994) (scales, firearms and large sums of cash are probative of an intent to distribute narcotics as they are "tools of the trade"); Alosa, 14 F.3d at 696 (drug ledgers are admissible as "'real evidence'" to prove that a drug business was conducted in a particular location, to prove the existence of a conspiracy, and to prove the dimensions of a conspiracy); United States v. Camilo Montoya, 917 F.2d 680, 682 (1st Cir. 1990).

Furthermore, the documents seized from the defendant's apartment are admissible, non-hearsay evidence proving the

defendant's connection to 214 Pavilion, 3rd Floor. See United States v. Serrano, 434 F.3d 1003, 1005 (7th Cir. 2006) (receipts, bills, and other documents are not hearsay when offered as circumstantial evidence linking a defendant to a particular location); Balthazard, 360 F.3d at 318 (notes seized from the scene admissible as real evidence of a drug business); United States v. Anello, 765 F.2d 253, 261 (1st Cir. 1985) (two letters seized from a defendant's trash admissible to prove membership in the conspiracy and knowledge of other co-conspirators); United States v. Mazyak, 650 F.2d 788, 792 (5th Cir. 1981) (letter admissible for non-hearsay purpose of linking conspirators to the location and to each other); United States v. Mejias, 552 F.2d 435, 446 (2nd Cir. 1977) (admitting hotel receipt, luggage invoice and business card to prove a link between the defendant the motel in which the drug activity occurred); see also United States v. Paulino, 13 F.3d 20, 24 (1st Cir. 1994) (rent receipt seized from the apartment containing the drugs was admissible as an adoptive admission).

D. Conspiracy

A conspiracy is an agreement between two or more persons to commit a particular crime. See United States v. Fenton, 367 F.3d 14, 19 (1st Cir. 2004). It is an agreement to disobey or to disregard the law. See United States v. Pacheco-Ortiz, 889 F.2d 301, 304 (1st Cir. 1989).

The government must prove that an agreement existed to commit the underlying offense and that the defendant elected to join the agreement intending that the underlying offense be committed. See United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir. 2005). But, under 21 U.S.C. § 846, the government need not prove the commission of an overt act in furtherance of the conspiracy. See United states v. Shabani, 513 U.S. 10, 17, 115 S.Ct. 382, 383 (1994). Furthermore, the government need not prove that the conspiracy succeeded or was achieved, so long as it proves that there was an agreement to engage in a criminal venture. See United States v. Waldron, 590 F.2d 33, 34 (1st Cir. 1979)(holding in an importation of stolen goods case, the "government need not prove that goods worth more than $5,000 were actually transported to make out a conspiracy . . . so long as the conspirators planned to transport sufficiently valuable goods"); United States v. Belardo-Quinones, 71 F.3d 941, 944 (1st Cir. 1995).

The government must prove that the defendant had knowledge of the basic agreement. See United States v. Marsh, 747 F.2d 7, 12 (1st Cir. 1984). However, the defendant need not have knowledge of all of the details of the conspiracy, nor of all of the participants in the conspiracy, nor of their acts. See United States v. Martinez-Medina, 279 F.3d 105, 113 (1st Cir. 2002). In fact, in a drug conspiracy, the government need not

prove the defendant knew the type or quantity of drug involved, "only that the offense 'involved' a particular type or quantity." United States v. Collazo-Aponte, 281 F.3d 320, 326 (1st Cir. 2002).

Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though that connection be slight, is sufficient to convict that defendant of knowing participation in that conspiracy. See Marsh, 747 F.2d at 13. The government must prove that each defendant knowingly and intentionally joined the conspiracy. See Pacheco-Ortiz,889 F.2d at 304. A defendant's knowing participation in a conspiracy may be established by proof of surrounding circumstances. See United States v. Paradis, 802 F.2d 553, 559 (1st Cir. 1986). The agreement need not be express, and may consist of no more than a tacit understanding. See Pacheco-Ortiz, 889 F.2d at id.

E. Acts of Co-conspirators

A co-conspirator is responsible not only for his own acts, but also for the acts of other conspirators done in furtherance of the conspiracy. See Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180 (1946); United States v. Rengifo, 858 F.2d 800, 807 (1st Cir. 1988). For purposes of criminal liability as a conspirator, one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of his co-

conspirators made after the formation of and in furtherance of the conspiracy. Thus, the defendant is bound by all acts committed by co-conspirators in furtherance thereof, including those acts committed without his knowledge before he joined the conspiracy. See United States v. O'Campo, 973 F.2d 1015, 1022-23 (1st Cir. 1992).

F. Recorded Interview

In this case, the government may introduce portions of a recorded interview with the defendant. The admissibility of audio recordings is a matter within the sound discretion of the Court. See United States v. Santana, 898 F.2d 821, 823-24 (1st Cir. 1990). To successfully challenge an audio recording on grounds of audibility, the inaudible parts must be so substantial as to make the remainder of the tape recording more misleading than helpful. See United States v. DiSanto, 86 F.3d 1238, 1253 (1st Cir. 1996); United States v. Font-Ramirez, 944 F.2d 42, 46-47 (1st Cir. 1991); United States v. Carbone, 798 F.2d 21, 24 (1st Cir. 1986).

A decision to permit transcripts of recorded conversations to be used by the jury is a decision within the sound discretion of the Court. It is the recording which is the evidence, not a transcript of the conversation. United States v. Morales-Madera, 352 F.3d 1, 7 (1st Cir. 2003); United States v. Campbell, 874 F.2d 838, 849-50 (1st Cir. 1989); Rengifo, 789 F.2d at 983.

A defendant's own statements in a recorded conversation are admissible by the government as admissions by a party opponent; however, if the defendant attempted to introduce those same statements, the statements would constitute inadmissible hearsay. See Fed.R.Evid. 801(d)(2)(A); United States v. Harwood, 998 F.2d 91, 98 (2d Cir. 1993) (rejecting a defendant's attempt to admit a co-defendant's statement as an admission by a party-opponent and recognizing "[t]he Government is the party opponent of both defendants."); United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible.").

G. Consciousness of Guilt

The defendant fled from the jurisdiction upon learning of the charges in this case. While remaining a fugitive, the defendant obtained a false identification card in the name of "Therry Denson" so as to avoid detection by law enforcement. The defendant's use of an alias and his fugitive status are admissible evidence of the defendant's consciousness of guilt. See United States v. Wallace, 461 F.3d 15, 25-26 (1st Cir. 2006); United States v. Benedetti, 433 F.3d 111, 117 (1st Cir. 2005); United States v. Levy-Cordero, 67 F.3d 1002, 1011 (1st Cir. 1995); see also United States v. Vega-Molina, 407 F.3d 511, 530 (1st Cir. 2005) ("Consciousness of guilt evidence is generally

admissible in a criminal case."); United States v. Gilbert, 229 F.3d 15, 26 (1st Cir. 2000).

In United States v. Wallace, 461 F.3d 15, 26 (1st Cir. 2006), the First Circuit accepted the government's use of flight evidence. The First Circuit affirmed the district court's decision to permit the government to introduce flight evidence because the record demonstrated that the defendant fled under an alias after the robbery and that he remained in flight even after his co-accused informed the defendant of the co-accused's arrest for the robbery. See id. In Wallace, the Court allowed this evidence even though there was an alternative explanation for the defendant's use of an alias aside from his consciousness of guilt of the charge pending. See id.

In the case at hand, the defendant presented the arresting Deputy U.S. Marshal, Joseph Murphy, with false identification in the name of "Therry Denson." He obtained this identification while a fugitive from these charges. The defendant admitted he actively tried to avoid arrest in this case, and he admitted that he obtained the false identification. Moreover, the defendant admitted that he knew of his co-accused's arrest on these charges and he admitted to discussing the case and the discovery prior to his arrest. The defendant's use of a false identity and his flight are facts the jury should be able to consider in making its determination of guilt.

IV. Requested Voir Dire and Jury Instructions

The government will file its proposed voir dire questions and jury instructions under separate cover.

V. Witness and Evidence List

The government will submit a witness and evidence list under separate cover prior to the commencement of trial.

VI. Estimated Time of Trial

The government estimates that it will take four days to conduct the trial.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys,

ROBERT CLARK CORRENTE,
UNITED STATES ATTORNEY

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U. S. Attorney
NY Bar
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
sandra.beckner@usdoj

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2007, a copy of the within "Government's Trial Memorandum" was filed electronically and is available for viewing and downloading from the ECF system. I also certify that a copy was mailed to Mr. Joseph DeCaporale at the following address:

The Calart Tower
400 Reservoir Avenue
Providence, Rhode Island 02907

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U. S. Attorney
NY Bar
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
sandra.beckner@usdoj