# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **CRIMINAL NO.** |
| | ) | **VIOLATIONS:** |
| | ) | **18 USC §371 - CONSPIRACY** |
| **1. JOHN M. CICILLINE** | ) | **18 USC §1503- OBSTRUCTION OF JUSTICE** |
| **2. JOSEPH A. BEVILACQUA, Jr.** | ) | |
| **3. JUAN GIRALDO** | ) | **18 USC §1001- FALSE STATEMENTS** |
| **4. LISA TORRES** | ) | |

**INDICTMENT**

**COUNT ONE: 18 U.S.C. §371 - Conspiracy**

The Grand Jury charges that:

**BACKGROUND ALLEGATIONS**

1. At all times material to this indictment, defendant JOHN M. CICILLINE was an attorney admitted to practice in Rhode Island.

2. At all times material to this indictment, defendant JOSEPH A. BEVILACQUA, Jr. was an attorney admitted to practice in Rhode Island.

3. At all times material to this indictment, defendant JUAN GIRALDO purported to be employed as a paralegal/interpreter for the law firm of defendant JOSEPH A. BEVILACQUA, Jr.

4. At times material to this indictment, defendant LISA TORRES purported to work as a paralegal/interpreter.

5. On or about August 14, 2002, law enforcement officers, including agents from the Drug Enforcement Administration ("DEA"), arrested John Mendonca and his wife, Jacqueline Mendonca, in

Warwick, Rhode Island, and seized, among other things, a quantity of marijuana and approximately $1.3 million in cash, resulting in drug trafficking charges being brought against the Mendoncas in Rhode Island Superior Court.

6. Defendant JOHN M. CICILLINE was retained by Jacqueline Mendonca to represent her in that case. Defendant JOSEPH A. BEVILACQUA, Jr. was retained by John Mendonca in October, 2002, to represent him.

7. As a result of this arrest in Warwick and additional investigation, a criminal complaint was issued on December 3, 2002, in the District of Massachusetts charging John and Jacqueline Mendonca with conspiracy to possess with intent to distribute marijuana and to engage in money laundering and structured currency transactions.

8. Both defendant JOHN M. CICILLINE and defendant JOSEPH A. BEVILACQUA, Jr. entered appearances in the District of Massachusetts as attorneys for Jacqueline and John Mendonca, respectively.

9. On February 3, 2003, an indictment was returned in the District of Massachusetts, entitled United States v. John Mendonca and Jacqueline Mendonca, Cr. No. 03-10029-MEL, charging them, among other things, with conspiracy to possess with intent distribute more than 100 kilograms of marijuana, in violation of 21 U.S.C. § 846; and conspiracy to commit and committing money

laundering, in violation of 18 U.S.C. §§ 1956(h) and (a)(1). Both John and Jacqueline Mendonca, if convicted by guilty plea or after trial, faced mandatory minimum prison sentences by statute of at least 10 years.

10. At all times material to the indictment, the sentencing of defendants in federal court operated under the Sentencing Reform Act of 1984. Under this Act, a Sentencing Commission devised Guidelines under which courts had to sentence convicted defendants according to uniform rules, and there was no discretion to depart from the required sentencing range except as specifically provided in the Guidelines. Pursuant to Section 5K1.1 of the Guidelines, the court was permitted to depart below the sentencing guideline range only if and when the government submitted a motion to the court asserting that the defendant, or a third party acting on the defendant's behalf with the government's knowledge and approval, provided substantial assistance in the investigation or prosecution of another offender ("substantial assistance motion").

11. Similarly, for certain convictions that require by statute a mandatory minimum sentence, pursuant to Title 18, United States Code, Section 3553(e), a court was permitted to depart below the sentencing guideline range only if and when the government submitted a substantial assistance motion.

12. The United States Attorney's Office for the District of Massachusetts is a part of the United States Department of Justice,

and, as such, is an agency in the executive branch of the United States Government. Assistant United States Attorneys assigned to the Criminal Division of the United States Attorney's Office are federal prosecutors with responsibility for representing the government in all criminal matters before the United States District Court for the District of Massachusetts.

**The Conspiracy Charge**

13. From in or about August, 2002, up to and including in or around November, 2004, within the District of Massachusetts, Rhode Island, and elsewhere, the defendants,

JOHN M. CICILLINE,
JOSEPH A. BEVILACQUA, Jr.,
JUAN GIRALDO,
and
LISA TORRES,

unlawfully, willfully and knowingly combined, conspired and agreed with each other:

a. corruptly to influence, obstruct, and impede the due administration of justice, and corruptly to endeavor to do so, in violation of Title 18, United States Code, Section 1503;

b. to defraud the United States, and an agency thereof, namely the United States Attorney's Office for the District of Massachusetts; and

c. to knowingly and willfully make, and cause others to make, material false statements to the United States

Attorney's Office for the District of Massachusetts in matters within that Office's jurisdiction, in violation of Title 18, United States Code, Section 1001.

14. It was a part and object of the conspiracy that the defendants would and did corruptly endeavor to obstruct the due administration of justice by, among other things:

a. soliciting and receiving large sums of money from John and Jacqueline Mendonca purportedly to obtain information from third parties and/or direct third party cooperation, which would then be provided to the government in order to induce it to file a substantial assistance motion on behalf of the Mendoncas;

b. inducing and pressuring John and Jacqueline Mendonca to plead guilty to the indictment to receive the purported benefit of the fraudulent third party information and/or cooperation under false pretenses; and

c. falsely concealing from the government, in order to secure a substantial assistance motion on behalf of the Mendoncas, the true source of information provided by John Mendonca and falsely representing the nature of the relationship between Jacqueline Mendonca and a proposed third party cooperator.

15. It was a further part and object of the conspiracy that the defendants would and did defraud the United States, and an

agency thereof, namely the United States Attorney's Office for the District of Massachusetts by, among other things, falsely concealing from the government, in order to secure a substantial assistance motion on behalf of the Mendoncas, the true source of information provided by John Mendonca and falsely representing the nature of the relationship between Jacqueline Mendonca and a proposed third party cooperator.

16. It was a further part and object of the conspiracy that the defendants would and did knowingly and willfully make, and cause others to make, material false statements to the United States Attorney's Office for the District of Massachusetts in matters within that Office's jurisdiction by, among other things, falsely concealing from the government, in order to secure a substantial assistance motion on behalf of the Mendoncas, the true source of information provided by John Mendonca and falsely representing the nature of the relationship between Jacqueline Mendonca and a proposed third party cooperator.

**OVERT ACTS**

17. In furtherance of the conspiracy and to effect its illegal objects, the following over acts, among others, were committed in the District of Massachusetts and elsewhere:

**The Defendants Collect Money from the Mendoncas Purportedly to Pay for Third-Party Information on Drug Activity**

a. In or around early November, 2002, defendant JOSEPH A.

BEVILACQUA, Jr. met with John Mendonca at the Plymouth House of Correction and told him that for a payment of several hundred thousand dollars, he, JOSEPH A. BEVILACQUA, Jr., could keep John Mendonca out of jail.

b. In or around early December, 2002, after the federal complaint was issued, JOSEPH A. BEVILACQUA, Jr. and JUAN GIRALDO met with John Mendonca again. They told him he needed to pay $100,000 "up front" (i.e. in advance) and said that they would provide third party cooperation in the form of a large drug bust that would be credited to John Mendonca.

c. In or around late December, 2002, JUAN GIRALDO went to the home of John Mendonca's mother and collected the $100,000 "up front" payment from her in the form of $70,000 in cash and $30,000 in checks made out to, respectively, JOSEPH A. BEVILACQUA, JR., JUAN GIRALDO, and two of JUAN GIRALDO's associates. JUAN GIRALDO represented to John Mendonca's mother that with the payment of this money, John Mendonca would get out of jail.

d. In or around June, 2003, while John Mendonca was still in jail awaiting trial, JOHN M. CICILLINE told Jacqueline Mendonca that he had spoken with JOSEPH A. BEVILACQUA, Jr. and JUAN GIRALDO about the $100,000 payment and reassured her that JUAN GIRALDO would provide information on drug activity that she and her husband would pass on to DEA as their own in order to get a sentence reduction.

e. On or about November 24, 2003, JOHN M. CICILLINE asked Jacqueline Mendonca for an additional $50,000, representing to her that he would show the money to JOSEPH A. BEVILACQUA, Jr. and JUAN GIRALDO to induce them to deliver on their promised third party information and cooperation.

f. On or about December 1, 2003, JUAN GIRALDO, JOSEPH A. BEVILACQUA, Jr. and JOHN M. CICILLINE met with Jacqueline Mendonca at their offices and confirmed that JUAN GIRALDO would be providing third-party cooperation to John and Jacqueline Mendonca in exchange for the money they had paid. Specifically, Jacqueline Mendonca asked, "Is it going to happen or is it not going to happen or are you just going to give me my money back?" JUAN GIRALDO replied, "It's only, it's not 'one happened,' it has to be like three or four happened. . . . If we are asked to do, like, three or four cases. We know what you want." JOHN M. CICILLINE said, "Right. The more the merrier." Jacqueline Mendonca said to JUAN GIRALDO, "And you are supposed to provide them." JOHN M. CICILLINE said, "Excuse me, he shouldn't even be discussing that with you. This shouldn't even, we should, you shouldn't have even heard that. He should know better. That's why you give him the money, he's supposed to take care of it. Nobody's supposed to talk about it."

g. On or about January 11, 2004, JOSEPH A. BEVILACQUA, Jr. met John Mendonca at the Plymouth County House of Correction and told him that he would be getting credit for a 900 pound marijuana

bust that JUAN GIRALDO had arranged, as well as for a 1,000 pound marijuana bust that JUAN GIRALDO was in the process of arranging. Specifically, JOSEPH A. BEVILACQUA, Jr. said, "About a month ago there was a bust, 900 pounds. Pot. . . . You're going to be getting credit for that. . . . JUAN GIRALDO went down to Mexico . . . to initiate something else for you. . . . There's supposed to be another load, maybe a thousand pounds coming up. That's going to be given credit to you and your wife."

h. Also on or about January 11, 2004, JOSEPH A. BEVILACQUA, Jr. told John Mendonca that he would assist John Mendonca in misrepresenting facts to the government so that John Mendonca would get credit for the 900 pound marijuana bust. Specifically, John Mendonca asked how he would get credit for the 900 pound marijuana bust when he knew nothing about it. JOSEPH A. BEVILACQUA, Jr., replied, "We don't have the reports [yet], just the complaint. . . . But you know how it's going to be -- it's going to be like you had this done for JUAN." John persisted: "How are they going to connect it back to me?" JOSEPH A. BEVILACQUA, Jr. replied, "You'll have all the info."

i. On or about March 5, 2004, JOHN M. CICILLINE told Jacqueline Mendonca that he would assist her in misrepresenting facts to the government so that she would get credit for an upcoming 50 kilogram cocaine bust. More specifically, Jacqueline Mendonca said to JOHN M. CICILLINE, "Last time we were here . . .

you had said . . . 'Something big's going to happen. We're going to tell you all the details, and then you can go and let your friend Dave [DEA Special Agent Dave Toracinta] know, and then you and John get credit for it.'" JOHN M. CICILLINE replied, "Right." JOHN M. CICILLINE also said, "This other thing is being put into action . . . . I mean 50 kilos. . . . JUAN's probably got that by truck this weekend. . . . It's just . . . you got to have stumbled on to this thing. . . . We just want to make it believable to the point where it's legitimate that you know about it. That you, you know, that you would come to get the information legitimately."

**The Defendants Pressure the Mendoncas to Plead Guilty**

j. On or about December 1, 2003, JUAN GIRALDO, JOSEPH A. BEVILACQUA, Jr. and JOHN M. CICILLINE met with Jacqueline Mendonca and advised her that John Mendonca's continuing refusal to plead guilty was preventing them from arranging for him to get credit for information on drug activity. More specifically, JUAN GIRALDO said to Jacqueline Mendonca, "Last week, you know, there's a good case in Rhode Island, some guys from DEA arrested, like, three Mexicans with 900 pounds, but I [wasn't] able to do anything because John [Mendonca], he don't want to plead." JOSEPH A. BEVILACQUA, Jr., then directed JUAN GIRALDO to leave the room and said to Jacqueline Mendonca, "Don't you see what he [JUAN GIRALDO] did with some of the money? . . . He gave it up, and he set somebody up with 900 pounds of pot or a thousand pounds of pot or something. . . .

That's what he does. Don't you understand [how] he works?" Jacqueline Mendonca reminded JOSEPH A. BEVILACQUA, Jr., about his promise to get her and her husband credit for third-party cooperation, and JOSEPH A. BEVILACQUA, Jr., responded, "In order for you to get that, you got to plead guilty."

k. Also on or about December 1, 2003, JOHN M. CICILLINE said to Jacqueline Mendonca, "What I told you was, get the money [i.e. the additional $50,000], give it to me, and then I'll tell them [i.e. JOSEPH A. BEVILACQUA, Jr. and JUAN GIRALDO] that I have it, that means then they'll be motivated to get the job done, finish it up. Isn't that what I told you the other day?" Jacqueline Mendonca confirmed and said, "And me and John [Mendonca] have go to plead before any of this happens?" JOSEPH A. BEVILACQUA, Jr., replied, "That's the only way you can get credit." Later in the conversation, JUAN GIRALDO said to Jacqueline Mendonca, "To be available to do this . . . you and John have to plead." JOHN M. CICILLINE said to Jacqueline Mendonca, "I think what the thinking is is that . . . once [you] plead, then he [JUAN GIRALDO] can go into action."

l. On or about January 11, 2004, JOSEPH A. BEVILACQUA, Jr. met John Mendonca at the Plymouth County House of Correction and told him that he and his wife would get credit for the 900 pound marijuana bust that JUAN GIRALDO had arranged only if John and Jacqueline Mendonca pleaded guilty. More specifically, JOSEPH A.

BEVILACQUA, Jr. said, "Now you're going to say you want to go to trial. [If] you go to trial, all this is off, you won't get credit for it." JOSEPH A. BEVILACQUA, Jr. also said, "if [you] go to trial in Massachusetts, all deals are off," and "if you don't plead, she's not [i.e. Jacqueline Mendonca is not] walking, she's going to go to camp for ten or fifteen years."

m. On or about March 6, 2004, JOHN M. CICILLINE and JUAN GIRALDO met John Mendonca at the Plymouth County House of Correction and continued to pressure him to plead guilty. More specifically, when John Mendonca said to them "if you didn't tell me the things that, that could happen, I mean, I just would have went forward," JOHN M. CICILLINE replied, "Once you plead, then we're going to be able [UI] now and help you [UI] because that's what it's all about." Later in the conversation, JOHN M. CICILLINE and JUAN GIRALDO said they had gotten someone else credit for a recent 500 "key" [kilo] bust. When John Mendonca asked, "Why not for me, man?", JUAN GIRALDO told him, "John, because you wouldn't plead, John . . . You wouldn't plead."

**JOHN M. CICILLINE Brings in LISA TORRES as Third Party Cooperator**

n. On or about March 16, 2004, JOHN M. CICILLINE met Jacqueline Mendonca at his office. He telephoned LISA TORRES and asked her about providing third party cooperation for the Mendoncas. Among other things, JOHN M. CICILLINE asked LISA TORRES, "So you can go in and do everything and then just credit

the other person? And that's no problem? . . . It's a Mass. case . . . so we want the credit to go to Boston. It's like a husband and wife situation. . . . The DEA agent is Toracinta. . . . Let me just make sure everything's all right and it's a go." After ending the call with LISA TORRES, JOHN M. CICILLINE said to Jacqueline Mendonca, "She's registered with the DEA, so she acts on your behalf." Jacqueline Mendonca asked, "So she's going to say that I did it?" CICILLINE replied, "Yes."

o. On or about April 1, 2004, JOHN M. CICILLINE explained to Jacqueline Mendonca how professional third-party cooperators such as Lisa Torres make money. Specifically, he said, "They're out there. They're always looking. . . . You're around and about. You're listening. You're hearing things. And then they end up, kind of, selling them the information basically. That's what they do."

p. On or about April 7, 2004, Jacqueline Mendonca met JOHN M. CICILLINE at his office and gave him $15,000 (as part of the $50,000 previously requested by JOHN M. CICILLINE to show JOSEPH A. BEVILACQUA and JUAN GIRALDO to get them to perform as promised). JOHN M. CICILLINE told Jacqueline Mendonca that "the other girl [LISA TORRES] is trying to do something" and had done it in the past. Jacqueline Mendonca asked, "How much is she making?" JOHN M. CICILLINE replied, "I'm not going to discuss that end. I don't need to discuss it. . . . Just get me what I have to get [i.e. the

$50,000], and I'll take care of everything."

q. On or about April 27, 2004, JOHN M. CICILLINE told Jacqueline Mendonca that although he would still try to get JOSEPH A. BEVILACQUA, Jr. and JUAN GIRALDO "moving," "the best chance of straightening out what they did [is] to get this girl [LISA TORRES] to do something to get you your 5K."

r. On or about May 17, 2004, JOHN M. CICILLINE introduced LISA TORRES to Jacqueline Mendonca in a parking lot. JOHN M. CICILLINE explained that the prosecutor in the Mendoncas' federal case had sent word through a DEA agent that any third party cooperator had to be a family member or close friend of the Mendoncas'. LISA TORRES then told Jacqueline Mendonca, "Now, do you have someone that you could say that I know that's my friend or a relative of yours . . . ? That I could say I know [you] through this person. . . ?" JOHN M. CICILLINE said, "And that, how can we make this connection here [UI]." LISA TORRES continued, "See, we have to make a connection. They're going to ask me, 'How do you know her?' Because you have to have some connection there." Later in the conversation, LISA TORRES said, "I'll have to make up a story that me and you know each other, that I met you . . . at Johnny's office . . ." JOHN M. CICILLINE then added, "That's the likely place you would have met anyway."

**JOHN M. CICILLINE and LISA TORRES**
**Make False and Misleading**
**Representations to the Assistant U.S. Attorney ("AUSA")**

s. On or about June 28, 2004, JOHN M. CICILLINE had a telephone conversation with the AUSA handling the Mendonca prosecution about the possibility of third party cooperation. The AUSA said, "It doesn't have to be a family member, but if it's close, you know, sort of personal friend, that's a possibility." JOHN M. CICILLINE replied, "At least that opens the door."

t. On or about July 1, 2004, JOHN M. CICILLINE spoke to the AUSA again about third party cooperation for Jacqueline Mendonca. The AUSA said, "I want to be clear on . . . any potential third-party cooperation. You know, if it's not a family member, it's got to be someone who is a close friend. Someone that, you know, she's known for years." When the AUSA asked, "How long have they known each other?", JOHN M. CICILLINE replied:

> Two, three years. And I'm -- I'm -- I'm guessing two or three years. You know, I -- I -- you know, I really don't know the answer to that. I mean, I -- I never got into it that much. I mean I -- I

JOHN M. CICILLINE then said he would talk to them to find out about the relationship and get back to the AUSA.

u. On or about August 10, 2004, in a telephone call, JOHN M. CICILLINE and the AUSA spoke again about the nature of the relationship between Jacqueline Mendonca and LISA TORRES. The AUSA asked, "How do they know each other?" JOHN M. CICILLINE replied, "I'm not sure if it's [through] a mutual friend or, I mean, I, you know, it might just be, I, ah, it's not a . . . big comfy relationship, you know, like they'd been hanging out together and

they were relatives."

v. On or about August 10, 2004, JOHN M. CICILLINE spoke by telephone with Jacqueline Mendonca and said that he had scheduled a time for Jacqueline Mendonca and LISA TORRES to meet with the AUSA. JOHN M. CICILLINE further said:

> He wants to know the relationship of you two and all that, and we've got to sit down and figure this thing out. . . . [One] day next week . . . we'll take a ride up there [i.e. to Boston] . . . and really try to figure something out that works for everybody. Because I was sort of honest with him. . . . I said, 'the relationship here is, you know, not real old. It's fairly new, but she's willing to help,' and he goes, 'Well, then, I want to hear about it a little more.'

w. On or about September 8, 2004, at the Barking Crab Restaurant in Boston, JOHN M. CICILLINE met with LISA TORRES and Jacqueline Mendonca to rehearse what they would say to the AUSA about the relationship. JOHN M. CICILLINE said to LISA TORRES, "When we get up there [UI] . . . '[She's] my friend, and I don't want nothing bad to happen to her.' You guys met at my office and became friendly. You guys were out there talking and got to know each other, and you [LISA TORRES] felt bad for her."

x. Also on or about September 8, 2004, JOHN M. CICILLINE, LISA TORRES and Jacqueline Mendonca met with the AUSA in his office. JOHN M. CICILLINE explained the relationship between Jacqueline Mendonca and LISA TORRES:

> Jackie's my client. I like her as my [UI], I've known her for a few years. Lisa [and I have] been friends for a long time. They met in my office, while we -- they commiserated about her problem. Lisa had some problems in her past. And basically said, 'I -- you know, I'll help [UI] your friend and I can help her out.'

LISA TORRES told the AUSA that she and Jacqueline Mendonca had met six months earlier in JOHN M. CICILLINE's office and had become friends who talked on the phone approximately twice a day about personal things. LISA TORRES said that her motivation for helping Jacqueline Mendonca was because "it's not easy to live in jail" and "she's a good person." When asked if JOHN M. CICILLINE could "vouch" that LISA TORRES and Jacqueline Mendonca were friends, JOHN M. CICILLINE replied, "Yeah, yeah."

y. On or about October 19, 2004, LISA TORRES asked Jacqueline Mendonca to meet her in the parking lot outside JOHN M. CICILLINE's law office and asked her for money, stating that JOHN M. CICILLINE knew of this request. LISA TORRES said, "You want me to help you, I'll help you, but this is how I make my money. I mean, you have to give me, to start, $20,000." LISA TORRES went on to say:

> I don't know what the situation is with your husband. I haven't gone into it. It all depends on what lawyer you have. I can't represent a lawyer because it's, this is not illegal, but it's not right because people aren't supposed to buy their way out of jail. . . . It's not legal. It's not illegal. There's no statute on it, but it's also not right.

z. Also on or about October 19, 2004, during that same meeting, LISA TORRES called JOHN M. CICILLINE on her cell phone and asked him to tell Jacqueline Mendonca that everything was okay. LISA TORRES then handed the phone to Jacqueline Mendonca and JOHN M. CICILLINE told her to go along with whatever LISA TORRES said.

All in violation of Title 18, United States Code, Section 371.

**COUNT TWO: 18 U.S.C. § 1503(a) - OBSTRUCTION OF JUSTICE**

The Grand Jury further charges that:

18. The allegations contained in Paragraphs 1 through 12, 17d, e, f, i, j, k, m, n through z are incorporated and realleged herein.

19. From in or around June, 2003, continuing through late October, 2004, in Boston and elsewhere within the District of Massachusetts, and elsewhere, the defendants

JOHN M. CICILLINE
and
LISA TORRES,

aiding and abetting each other, did corruptly influence, obstruct and impede, and corruptly endeavor to influence, obstruct, and impede, the due administration of justice, that is, the criminal case entitled United States v. John Mendonca and Jacqueline Mendonca, Cr. No. 03-10029-MEL, then pending in the United States District Court for the District of Massachusetts, by falsely representing the nature of the relationship between Jacqueline Mendonca and LISA TORRES as a proposed third party cooperator in order to induce the government to file a substantial assistance motion on behalf of the Mendoncas so that the court would impose lesser sentences upon them.

All in violation of Title 18, United States Code, Sections 1503(a) and 2.

**<u>COUNT THREE</u>: 18 U.S.C. § 1001 - Making False Statements**

20. The allegations contained in Paragraphs 1 through 12, 17d, e, f, i, j, k, m, n through z are incorporated and realleged herein.

21. On or about July 1, 2004, in the District of Massachusetts, the defendant,

JOHN M. CICILLINE,

in a matter within the jurisdiction of the United States Attorney's Office for the District of Massachusetts, an agency of the United States Department of Justice, did knowingly and willfully make a false, fraudulent, and fictitious material statement and representation, by stating, when asked by an Assistant United States Attorney how long Jacqueline Mendonca and LISA TORRES have known each other, the following:

> **Two, three years. And I'm -- I'm -- I'm guessing two or three years. You know, I -- I -- you know, I really don't know the answer to that. I mean, I -- I never got into it that much.**

All in violation of Title 18, United States Code, Section 1001.

**COUNT FOUR: 18 U.S.C. § 1001 - Making False Statements**

22. The allegations contained in Paragraphs 1 through 12, 17d, e, f, i, j, k, m, n through z are incorporated and realleged herein.

23. On or about September 8, 2004, in Boston, within the District of Massachusetts, the defendants,

JOHN M. CICILLINE
and
LISA TORRES,

aiding and abetting each other, in a matter within the jurisdiction of the United States Attorney's Office for the District of Massachusetts, an agency of the United States Department of Justice, did knowingly and willfully make a false, fraudulent, and fictitious material statement and representation, by stating and affirming that:

a. LISA TORRES and Jacqueline Mendonca met in JOHN M. CICILLINE's office;

b. they became friends, frequently talking to each other about their personal problems;

c. LISA TORRES's motivation for providing third party cooperation was her friendship with Jacqueline Mendonca.

All in violation of Title 18, United States Code, Sections 1001 and 2.

A TRUE BILL

FOREPERSON OF THE GRAND JURY

ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS; January 4, 2007

Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK