IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| VS. | : | CR 06-106-02S |
| | : | |
| KHALID MASON | : | |

**AFFIDAVIT OF PAUL PRICE, JR.**

I, Paul Robert Price, Jr., affirm and declare as follows:

1. I have personal knowledge of the facts set forth in this affidavit and could competently testify thereto if called as a witness. I submit this affidavit in support of the Defendant Khalid Mason's Motion to Suppress.

2. Defendant Khalid Mason is my son.

3. In January of 2004 I became aware of a warrant for my son's arrest.

4. My son informed me that Attorney John M. Cicilline and his assistant, Ms. Lisa Torres, would be representing both him and Mr. Derek Isom, with respect to the warrant for my son's arrest and with respect to Mr. Isom's arrest.

5. I met with Ms. Lisa Torres on four separate occasions in early 2004. The purpose of my meetings with Ms. Torres was to pay her for John M. Cicilline's legal fees on behalf of my son, Khalid Mason, and his friend, Derek Isom.

6. I was informed by Ms. Torres that she was employed by Attorney John M. Cicilline and that payments made to Ms. Torres were for Attorney Cicilline's legal fees for representing my son and Mr. Isom.

7. Throughout January and February of 2004, I spoke with Ms. Torres numerous times on the telephone. She called me and I called her regarding payments for my son's and Mr. Isom's legal fees and other issues.

8. Ms. Torres was using at least two different cell phones during this time and I placed and received calls to both of these cell phone numbers in order to speak with Ms. Torres. My cell phone bills from 2004 would corroborate this statement.

9. The first time I met Ms. Torres, she instructed me to meet her outside of the Providence County Superior Courthouse. I pulled my Blue Monte Carlo to the side of the road on the hill next to the courthouse that leads to Benefit Street in Providence. Ms. Torres came out of the courthouse and got in my car. I remember Ms. Torres telling me that everything was going to be fine and that she knows "how they work." I understood this to mean that she knew how the cops in Providence work. Ms. Torres referred to Attorney John Cicilline as "my boss Johnny" several times. During this first meeting, I paid Ms. Torres $10,000.00 cash as a retainer for John Cicilline to represent my son and Mr. Isom. I obtained this money from Mr. Isom's cousin, Andre Isom.

10. Approximately one week later, I met Ms. Torres for the second time. This time, Ms. Torres told me to meet her on Harris Avenue in Providence near Club Fantasies, by the old courthouse and the old DMV building. When I arrived, Ms. Torres was already there with another woman. I pulled up and Ms. Torres got into my car. I paid Ms. Torres another $5,000.00 cash for my son's legal fees.

11. Soon thereafter, I met Ms. Torres for a third time. This time Ms. Torres instructed me to meet her at Grande's Law Offices on Plainfield St. near Olneyville, Rhode Island. I met Ms. Torres outside the building and attempted to pay her. She would not let me

pay her outside and told me to come inside. Once inside, I paid Ms. Torres another $5,000.00 cash for legal fees.

12. The fourth time I paid Ms. Torres was on February 16, 2004. This time, I did not actually meet with Ms. Torres. Ms. Torres instructed me to go to the Grande Law Offices and leave my payment there for her. I left the payment, another $5,000.00 in cash, with a woman who appeared to be a receptionist. I asked for a receipt and was provided one. A copy of the receipt is attached at Exhibit A to this Affidavit.

13. During this time, my son spoke with John Cicilline, but I did not. I only dealt with Ms. Torres.

14. Around this time, John Cicilline and Ms. Torres demanded significantly more money in order to help my son and Mr. Isom. I believe they demanded $100,000.00 each. My son did not have this kind of money. I did not have this kind of money. I could not borrow this kind of money from family or friends.

15. Within weeks of having paid John M. Cicilline $25,000.00 in cash to represent my son and Mr. Isom, my son became very skeptical that John M. Cicilline would actually get his warrant lifted and get Mr. Isom out on bail. My son decided to fire Attorney Cicilline and hire a new attorney. We did not pay him any more money.

16. My son demanded that Ms. Torres and John Cicilline return the $25,000.00 that I had paid them for John Cicilline to represent my son and Mr. Isom. My son, I am informed, told John Cicilline and Ms. Torres that we would go to the police if the money was not returned.

17. Ms. Torres informed me that she was traveling to the Dominican Republic and that she would speak with me when she returned. I spoke with Ms. Torres one time while she

was in the Dominican Republic. Ms. Torres contacted me upon her return and we scheduled a place and time to meet.

18. I was concerned about my personal safety because we had threatened to go to the police if the money was not returned. Therefore, I suggested we meet at the RIPTA bus station on Elmwood Avenue in Providence because there are guards and cameras there.

19. Ms. Torres met me at the Elmwood Avenue station along with another woman. Ms. Torres returned $15,000.00 of the $25,000.00. Ms. Torres explained to me that she and John Cicilline could not return part of the money paid, $10,000.00, because they had used that to take Detective Scott Partridge to the Super Bowl and that they had already done "legwork" on behalf of my son and Mr. Isom. The entire time I was meeting with Ms. Torres, a brand new Lexus was circling around us, watching us. I was concerned that someone was going to rob me after the money was returned to me.

20. Numerous times during my meetings and conversations with Ms. Torres, she informed me that she knew Detective Scott Partridge well and that he was working with John Cicilline to get my son's warrant lifted and to get Mr. Isom out on bail. Ms. Torres referred to Detective partridge as "Scotty." I was led to believe by Lisa Torres that police cooperation, including Detective Partridge, was to be involved in obtaining the lifting of the warrant for my son and obtaining the release of Mr. Isom.

21. My son was arrested in October 2006.

22. My son told me that the crack seized at the search of 214 Pavilion must have been placed there by the cops.

23. My son told me that the sworn statements in the search warrant application are all lies and that he never participated in the controlled buy alleged in the affidavit.

24. My son has told me over and over that he never once drove in Mr. Isom's car with Mr. Isom.

25. In January 2007, I learned of the Indictment charging John M. Cicilline in the news and immediately took the following day off of work. The next day, January 10, 2007, I drove to Boston to the United States District Court for the District of Massachusetts. It was my understanding that this was one day before a hearing was scheduled regarding the Cicilline Indictment. I spoke with a clerk at the Clerk's Office and informed her that my son was victimized by John Cicilline, Lisa Torres, and Scott Partridge and that I wanted to file a complaint. The clerk returned with a form for me to fill out. I filled out a "Complaint Form" and gave it to the Court. A copy of the Complaint Form is attached as Exhibit B to this Affidavit.

26. The Clerk in Boston told me to speak with someone in Providence regarding my concerns and complaint. I believe she referred me to James (Jim) McCormack from the DEA in Rhode Island. I knew of U.S. Marshal Michael Wattik because my son spoke with him after he was arrested and my son met with him in his cell after appearing in court for one of his attorneys to withdraw.

27. I contacted Mr. Wattik on the phone on my way to work one morning. We had planned to meet at the bus station. While still on the phone with Mr. Wattik, he told me to look behind me and when I did, his truck was right there. I got into Mr. Wattik's dark blue pick-up truck with super-black tinted windows. I explained to him that "dirty cops" were involved in my son's arrest. Michael Wattik told me to get an attorney, before sharing all of the information my son had, so that my son would not lose out on anything. This conversation occurred during a

time when my son's attorney had withdrawn and he was unrepresented. I had and still have Mr. Wattik's phone number programmed in my cell phone.

28. Wattik informed me that "he was just the small man in this whole thing" and that I would have to speak with "his boss" from this point on. I believe he gave me Mr. McCormack's number.

29. I tried to follow-up with Michael Wattik numerous times after this, but he did not return my calls.

30. I spoke with Mr. Jim McCormack several times regarding my son's situation. I explained to him that we were very concerned because numerous lawyers had withdrawn. Mr. McCormack told me that they, meaning the U.S. Marshals Office and the Government in general, "were aware that something was wrong." I told him that my son told the U.S. Marshals about Cicilline when he was arrested and that one of the Marshals later admitted to my son that he knew that my son was telling them the truth. I had and still have Mr. McCormack's phone number programmed in my cell phone.

31. I also explained to Mr. McCormack that I could not understand why no one was pursuing the dirty cops. I suggested to Mr. McCormack that I thought it was because (1) there would be consequences on prior convictions; or (2) it would ruffle too many feathers with respect to the Indictment in Boston. McCormack told me that I should focus on my second theory.

32. Mr. McCormack told me that he would speak with the United States Attorney's Office and let them know that my son wanted to talk to them about the dirty cops. I followed up with him to see if he had spoken with the prosecutor to set up a meeting so my son could share

this information. Mr. McCormack said that he would tell the prosecutor and the Judge that my son needed representation from outside Rhode Island so that my son would get a "fair shake".

33. During this time I also contacted the FBI to investigate the police involvement in the charges against my son. I spoke with someone in Virginia who directed me to someone in Boston, MA. The information I provided was sent to a Special Agent in Providence. I believe her name was Kim. I do not recall her last name. I never followed-up with her because my son was appointed new counsel shortly thereafter.

34. My communication with Mr. McCormack ended when Mr. Connolly and Ms. Passalacqua were appointed to represent my son in mid-March 2007.

I declare under penalty of perjury under the laws of the State of Rhode Island that the foregoing is true and correct and that this affidavit is executed at Providence, Rhode Island on June 1, 2007.

Paul Robert Price Jr
Paul Robert Price, Jr.

Subscribed and sworn to before me this 1 day of June, 2007.

Kandy M. Marchand
Notary Public

My Commission Expires 03/22/2010

# EXHIBIT A

No. ______ Feb 16 2004

Received from Paul Price

CASH

Five thousand —— Dollars $\frac{}{100}$

For Legal fees RE: Khalid Mason

For Lisa Torres

$5,000.00 [signature]

# EXHIBIT B

RECEIVED
U.S. ATTORNEY
BOSTON MASS

JAN 10 4 22 PM '07

Christine Brean

U.S. Department of Justice

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

## COMPLAINT FORM

**TO:** **DUTY ATTORNEY**

**FROM:** Paul Robert Price JR. Providence
Cell 473-8960

**NATURE OF COMPLAINT:**

I made this trip from Providence, RI when I read in yesterdays paper that both (John Bevalaqnia and John Cesilinta Attorneys at law) were involved with conspiricing to take money or other crimes with drugs dealers. I also seen were two other people were involved Lisa Torres and The other name I didn't know. But I do know that Lissa and John Cesilifla were involved with a Police Officer named Det. Scott Partridge of Providence RI. How this Police Officer didn't become caught is unclear to me.

Any questions Please Call 473-8960