UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| United States of America, | : | |
| Plaintiff, | : | |
| v. | : | CR No. 06-106-02S |
| Khalid Mason, | : | |
| Defendant. | : | |

**DECISION AND ORDER**

Introduction

Public corruption strikes at the core of a community's confidence in its leaders and threatens the fundamental operation of our system of government; and the District Court of Rhode Island has, to be sure, seen its share of public corruption cases over the years. Accusations that advance credible claims of corruption, therefore, deserve our highest concern and scrutiny. Such scrutiny benefits not only the public, but our leaders, too, by ensuring (or restoring) actual or apparent legitimacy to the function of government. The allegations made in this case were extraordinary, and were supported by an equally extraordinary alleged criminal conspiracy that has implicated at least two members of the Rhode Island criminal defense bar and their paralegals, all of whom have been indicted in federal court in Boston. The alleged conspiracy, which is sketched out in more detail below, is one that, if true,

involved an attempt (apparently unknown to the government) to corrupt the federal criminal justice system in Massachusetts.

The government fought hard to deny these allegations the light of day, fearing the public airing of what it perceived to be unwarranted claims would sully the reputation of police officers (and perhaps other officials).[1] But to deny the complainants in this case the opportunity to pursue their serious - and partially corroborated - allegations in a judicial forum, with its attendant guarantees of independence and impartiality, would be to render this Court nothing more than a shill of the government, and in this case, the Providence Police Department. Moreover, it would stifle the critical function - and responsibility - this Court has to act as an impartial guardian of the rule of law; and in this case, that function has performed admirably, allowing the complainants to pursue their allegations through the adversarial process. In the end, although many questions remain about the role of certain players in the alleged criminal conspiracy, this hearing served its purpose by revealing scant direct evidence supporting the initial allegations. But, at the same time, it did expose decrepit policies and practices of the Providence Police Department that have supplied fodder for the allegations in this case; indeed, it

---

[1] It is not lost on the Court that some of the posturing and concern over these accusations may stem from the fact that one of the indicted lawyers is the brother and former law partner of the Mayor of Providence.

may be that this motion and hearing could have been avoided if the department's conduct had been more professional. If left unchanged, these shoddy practices threaten both the fundamental integrity of the investigations conducted by the Providence Police and, unavoidably, the public's faith in the department's competency; they therefore must be corrected.

The Motion to Suppress

Khalid Mason seeks the suppression of evidence, including $2,360, drug paraphernalia and approximately 303.91 grams of cocaine base, found pursuant to the execution of a search warrant at 214 Pavilion Avenue in Providence, Rhode Island on January 16, 2004. The search warrant was acquired and the subsequent search of the residence carried out by members of the Providence Police Department, at the instigation of Sergeant Scott Partridge and Detective Peter Conley, who received apparently reliable information from a confidential informant (CI) that Mason and his friend (and co-defendant), Derrick Isom, were selling crack cocaine out of the 214 Pavilion Avenue residence. The detectives arranged for the CI to conduct an initial controlled purchase of crack cocaine from Mason and Isom and then arranged for a second controlled purchase from Isom alone. On this basis, Sergeant Partridge swore out an affidavit and obtained a search warrant. On January 16, 2004, after setting up surveillance, detectives with the narcotics unit observed Isom leave the residence. Believing

him to be the only occupant at that time, a number of detectives stopped Isom after he had driven some distance away from the residence (he initially tried to elude police on foot) and other officers, including Partridge, executed the search warrant that netted the drugs, money and paraphernalia from the residence.

The basis for Mason's challenge to the seizure rests on his belief that Partridge had colluded with Attorney John M. Cicilline (who became Mason's attorney, albeit briefly, immediately after he was arrested on the drug charges) or his associate and paralegal to plant drug evidence at the 214 Pavilion Avenue residence in order to extort money (and possibly drugs) from Mason and Isom. A basic sketch of the overall scheme alleged by Mason contours around Cicilline, his law partner Joseph Bevilacqua and his paralegal, Lisa Torres, who, along with another paralegal/employee are indicted in federal court in Boston on charges of conspiracy, obstruction of justice and making false statements. Mason claims that Cicilline, usually through Torres, would seek to represent certain defendants charged with drug crimes. In exchange for significant sums of money (on the order of between $25,000 and $100,000) or drugs, Cicilline and Torres would either (1) feed the defendants useful information about other drug deals in the area (which they helped set-up) so that the defendants could claim the information as their own in order to cooperate with the prosecution and law enforcement, and obtain sentence reductions under § 5K of

the Federal Sentencing Guidelines; or (2) use the defendants' money to bribe certain police officers to "drop the charges" currently pending against the defendants. The alleged scheme also had a business-development angle, wherein Partridge, with Cicilline's knowledge, would allegedly frame certain defendants with a drug crime so that Cicilline could then engage those defendants in representation; then, after extorting large sums of money, Cicilline would successfully get the charges dropped by paying Partridge some of the defendants' money.

In support of his suppression motion, Mason sought a Franks hearing to demonstrate that the affidavit and search warrant procured by Partridge contained deliberate falsehoods concerning the probable cause justifying the search of 214 Pavilion Avenue. Normally, because "a presumption of validity . . . [exists] with respect to the affidavit supporting the search warrant," Franks v. Delaware, 438 U.S. 154, 171 (1978), obtaining an evidentiary hearing is difficult and requires a substantial preliminary showing that the affidavit contains a false or reckless statement. See id. at 171 ("[T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."). Moreover, the inquiry in a Franks hearing, and therefore the substantial preliminary showing necessary to obtain a Franks hearing, must focus on the veracity of the affiant, not on the veracity of the affiant's source of information, see United States

v. Tzannos, 460 F.3d 128, 138 (1st Cir. 2006); and the alleged false statement must be necessary, not incident, to a finding of probable cause. See United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002).

In this case, what took Mason's allegations out of the realm of the conclusory, and what motivated this Court to grant Mason's request for a Franks hearing, is the well-documented fact that Cicilline, Bevilacqua, and Torres have been indicted on federal charges for a scheme that, in many respects, appeared to corroborate at least part of Mason's version of events.[2] See Def. Ex. BB. Nevertheless, in order to succeed at a Franks hearing and compel suppression, Mason is saddled with the significant burden of establishing that the affiant, in this case, Partridge, made material misstatements about the probable cause elements contained within the search warrant. See Ranney, 298 F.3d at 78. Whatever corroboration the Cicilline indictment and the testimony (or lack thereof) of Cicilline and Torres may add to Mason's allegations, there is nothing in the Cicilline indictment to indicate or suggest that Partridge was involved in the scheme or that his involvement

---

[2] This Court required more, however, and instructed Mason to submit an evidentiary proffer in support of his motion. Counsel's proffer (which included offers of proof as to the anticipated testimony of Mason, co-defendant Isom, Mason's father and others, as well as the expected invocation of the Fifth Amendment by Cicilline and Torres regarding detailed questions about the alleged conspiracy) was more than enough in this Court's view to merit a hearing.

triggered the falsification of his affidavit and the search warrant. Consequently, Mason was left with the burden at the Franks hearing to submit competent evidence that Partridge lied about the controlled buys that formed the basis for the search warrant.

The hearing lasted two and a half days and consisted of testimony from the defendant, his father, with whom he shared the residence, a number of incarcerated witnesses, Providence Police Department officers and Cicilline and Torres. Of these witnesses, Cicilline and Torres, along with several of the incarcerated witnesses, pleaded the Fifth Amendment in response to questions asked by Mason's extremely able counsel concerning the alleged scheme operated out of Cicilline's office. Partridge and his partner, Detective Conley, testified that the buys were legitimate and from a reputable CI, and that the information contained in the affidavit and search warrant was truthful. Mason, his father and his co-defendant Isom all testified about the purported scheme that Cicilline ran and, additionally, vehemently denied that the drugs found at the 214 Pavilion Avenue residence were theirs (either Mason's or Isom's).

The testimony of Mason and his father, not contradicted by Cicilline or any other witness, established that very swiftly after the arrest of the defendants, they were placed in contact with Lisa Torres on behalf of Cicilline, who was retained and paid a

substantial amount of money in cash. It was asserted that Torres made claims that Cicilline could make the charges go away with this money. Specifically, the Masons claim that Torres said that Cicilline would take Partridge to the 2004 Super Bowl and they would work it out there.

Cicilline's, and to some extent Torres's, invocation of the Fifth Amendment and their refusal to answer questions about their relationship with Partridge or other police officers in order to prevent self-incrimination invite serious speculation about certain of Mason's allegations. For instance, Cicilline pleaded the Fifth Amendment to these two questions: (1) "were you making money at that time [January 2004] off of planting - having drugs planted on people who had a history of drug involvement such as Mr. Isom and Mr. Mason so that your clients could benefit from that?"; and (2) "can you tell us to a certainty that nobody working on your behalf in January of 2004 planted drugs at 214 Pavilion Avenue in order to frame Mr. Isom and Mr. Mason?"[3] But this colloquy establishes

[3] Mason's counsel also asked Cicilline an additional number of specific questions, to which he pleaded the Fifth Amendment. The questions were asked individually, as opposed to categorically (as Mason's counsel had done with Torres) because initially Cicilline had bizarrely refused to plead the Fifth Amendment to questions concerning his relationship with Mason. When this Court then directed Mason's counsel to ask Cicilline specific questions related to his relationship with Mason, Cicilline, instead of answering them (which he just a moment before had indicated he would do), pleaded the Fifth Amendment. This strange colloquy, like most of Cicilline's and Torres's (non)testimony, raised far more questions than it answered. For purposes of this hearing, however, the impact is negligible.

nothing concrete and, without more, it simply is not sufficient to vault Mason's allegations concerning Partridge above the Franks bar.[4]

In fact, on the matter of establishing that Partridge lied about the controlled buys in order to obtain a fraudulent warrant, Mason was unable to adduce any credible supporting evidence. Neither Mason nor Isom ever met with Partridge and could not

---

[4] Roger Murray, an inmate currently incarcerated on methamphetamine charges, also refused to answer the following provocative questions, invoking the Fifth Amendment:

> Q. Was there a friend of yours who informed you that he would pay detective or sergeant Scott Partridge $15,000 a month in order to keep him straight?
>
> . . . .
>
> Q. [D]id that person tell you that he paid detective Scott Partridge $15,000 a month 'for protection?'
>
> . . . .
>
> Q. [Did] that same individual tell you that he paid detective Partridge $15,000 a month for 'a green light to deal?'
>
> . . . .
>
> Q. Was there an occasion prior to your most recent incarceration where you were physically present and observed your friend, [a] significant drug dealer, actually pay $15,000 in cash to sergeant Partridge in your presence?
>
> . . . .
>
> Q. Did you tell Khalid Mason in the past and again last night about this friend who was a significant drug dealer who paid money to detective Partridge?

As with the Cicilline testimony, regardless of how explosive the implications of these questions, and irrespective of whatever inference such an invocation of the Fifth Amendment may have at some later juncture, see United States v. Deutsch, 987 F.2d 878, 883-84 (2d Cir. 1993), at this stage, this testimony comes nowhere close to either credibly implicating Partridge in the scheme generally, or, more importantly, implicating Partridge specifically within the context of Mason's case. Consequently, it, like the Cicilline and Torres testimony, fails to bolster Mason's claim regarding the falsification of the search warrant affidavit.

testify that Cicilline had met with him either; instead, they could only testify that Cicilline boasted to them that he would meet with "Scotty" [Partridge] to make the charges disappear.[5] Moreover, the CI that Partridge used to obtain the controlled buys appears to be completely unrelated to Cicilline and Torres and had been used, reliably, a number of times before;[6] Partridge was not in attendance at the 2004 Super Bowl, something which Cicilline had purportedly claimed; and there was simply no testimony connecting Partridge with Cicilline's scheme in any way.

Without minimizing the disturbing nature of Cicilline's alleged scheme and Mason and Isom's possible (un)knowing involvement in it, or even, for that matter, the shoddy police work that led to the ultimate seizure of the drugs from 214 Pavilion Avenue (which is addressed below), Mason simply has not presented any credible evidence that Scott Partridge lied in his affidavit or the search warrant.[7] Accordingly, because he has not shown that the

---

[5] This boast became a common theme during the hearing; combined with the absence of any direct evidence linking Cicilline with Partridge, it would most likely appear that Cicilline and Torres were engaged in a serious game of extortion, promising results through connections that simply did not exist.

[6] The Court denied Mason's motion to obtain the CI's identity after reviewing the CI file and questioning Providence Police and government attorneys in camera to ensure that no connection existed between the CI and Cicilline and Torres. Moreover, the Court found that the government had established that revealing the identity of the CI would create a safety risk.

[7] It should be noted that although the circumstantial evidence Mason presented was not sufficient to warrant suppression, its

affiant has made a false statement, Mason's motion to suppress is DENIED.

Additional Matters

Some further discussion is called for because the hearing revealed some troubling practices of the Providence Police Department. In what seems to be a recurring theme, Sergeant Partridge and his partner Detective Conley freely admitted on the stand that they failed to contemporaneously document any single fact, aspect or event in their ongoing investigation of Mason, Isom and the 214 Pavilion Avenue residence. Partridge's testimony in this regard was truly astonishing. After admitting that the investigation and surveillance involved a potentially large drug arrest and occurred over a number of weeks, this colloquy ensued:

> Q. Nevertheless, you're observing evidence that may come into play for example in a hearing like this, correct?
>
> A. That's correct.
>
> Q. Might come into play in a jury trial, correct?
>
> A. That's correct.
>
> Q. So it's important to take steps to preserve those observations, correct?
>
> A. Yes.
>
> Q. Now, you're familiar with surveillance reports, correct?
>
> A. I don't use surveillance reports, no.

---

effect may be different at trial.

Q. Did you know that it's a routine practice of the FBI to do surveillance reports any time that they observe alleged drug operations such as this?

A. I wouldn't know that the FBI filed surveillance reports.

Q. Did you have a note pad in December of 2003?

A. I may have.

Q. Is that part of the materials that are issued to you by the Providence Police Department so that you can record observations when you're doing your work?

A. No. They don't issue a pen and pad, no.

Q. So during this six-week long surveillance investigation that you were conducting on th[ese] two addresses, tell me how many notes did you take of what you observed?

A. I couldn't tell you.

Q. Did you take one?

A. I'm sure I took some notes.

Q. Okay. And where are those notes today?

A. Probably gone. I don't have them.

Q. So you probably took some notes, and then you arrested Mr. Isom and had an arrest warrant issued for Mr. Mason but as to notes you said I don't need these, I'm going to just throw them out?

A. Would have been small notes jotted on a piece of paper, plates.

Q. That could be important?

A. Could be.

Q. The reason one would take recorded license plates of those who are visiting a suspected drug operation would be to identify who's a participant in a drug operation, correct?

A. It could lead to that, yes.

Q. So what [is it] that made you conclude that this is information that you recorded in your notes that wasn't worth keeping and was just worthy of throwing out?

A. I don't know exactly.

Q. Okay. Well, here we stand, Mr. Mason has been arrested, based upon your surveillance and to my knowledge and please correct me if I'm wrong, there isn't a shred of paper to show what you observed during this six week surveillance period; is that correct?

A. That's correct.

Q. There isn't a note, correct?

A. That's correct.

Q. There isn't a photograph, correct?

A. That's correct.

Q. There isn't a videotape, correct?

A. That's correct.

Q. There isn't a written surveillance report, correct?

A. That's correct.

Q. There's nothing, correct?

A. Pertaining to notes, no.

Q. Except for your sworn testimony?

A. That's correct.

. . . .

Q. Did you ever go through any training in conjunction with your works on the narcotics squad?

A. Yes.

Q. Did anybody ever encourage you to take notes when

> you're conducting surveillance of a drug operation?
>
> A. No. Not that I can recall.
>
> Q. Nobody ever suggested that it's a good idea to write down the descriptions of people, the number of people going in and out of the house, the automobiles that are coming and going, the volume of people, the time of day?
>
> A. No. No one ever suggested that to me.

Conley, to his credit, acknowledged that his training included the importance of documentation and note-taking, but, alas he too created not a single note documenting the surveillance:

> Q. Did the DEA training cover how important it is to make a record of your observations when you're conducting an investigation?
>
> A. On that particular subject, I can't recall if there was or not.
>
> Q. Do you recall receiving any training from any source about the importance of making a record when you're conducting a surveillance?
>
> A. I want to say yes.
>
> Q. When did you receive that training?
>
> A. It was probably in one of those classes that I attended.
>
> Q. All right. What do you recall being instructed about the importance of making a record when you're conducting a surveillance?
>
> A. To recollect your memory on occasions like this.
>
> Q. Did the instructor say it's recommended that careful notes be prepared to describe what you're physically observing at the time?
>
> A. I can't recall exactly what the particulars of what should be done.

Q. Do you remember being instructed that it's important to record the dates, the time of day, the individuals involved, the location, that type of information?

A. Yes.

Q. Any identifying information such as physical descriptions, descriptions of automobiles, license plates, that type of thing?

A. Correct.

Q. And do you have any such information from the surveillances conducted at 214 Pavilion?

A. No, I do not.

Q. Do you know whether the Providence Police Department does?

A. I know I don't.

Q. You don't know of anybody else that has such information, do you?

A. Correct.

Could it possibly be that these two officers, veterans of the Providence Police Department, conducted an important drug investigation that ranged over six weeks, implicated two potential high-level drug dealers and a large quantity of drugs, involved multiple days of undercover surveillance and resulted in a large-quantity drug seizure, and did not take a single note of their observations? Could it be, as Partridge said, that the Providence Police Department does not train its officers to take notes? Does not even supply pads and pens or pencils, cameras or any of the basic tools of undercover investigation? Unfortunately, it would

appear to be so. Even Conley could recall only scant training on the benefits of note-taking - and this training was provided by the DEA, not the Providence Police.

Without any notes, Partridge could remember precious little of the specifics of the investigation; yet he appeared indifferent to the suggestion that contemporaneous notes and reports could offer a more concrete and airtight account of the events leading up to the seizure. Indeed, it almost seemed in listening to Partridge's testimony that he was offended at the suggestion that his three year-old memory of events should not suffice. If this is a reflection of the attitude of the Providence Police Department, it must change. Contemporaneous note-taking and documentation of events, observations, and interactions allow officers to create and preserve a more reliable account of events and conversations than testimony from memory affords. Looking at Partridge's and Conley's testimony illustrates this point more clearly than any hypothetical. Partridge and Conley were both unsure about the number of times they surveilled the 214 Pavilion Avenue residence, and neither could remember any specific details about the individuals they observed entering and exiting the residence.

Courts and commentators have consistently struggled to understand the resistance by some in law enforcement to certain practices that offer the possibility of increasing the reliability of evidence in criminal cases. <u>See</u>, <u>e.g.</u>, <u>United States v.</u>

Mansker, 240 F. Supp. 2d 902, 910-11 (N.D. Iowa 2003); United States v. Azure, 1999 WL 33218402 (D.S.D., Oct. 19, 1999); Erik Lillquist, Improving Accuracy in Criminal Cases, 41 U. Rich. L. Rev. 897 (2007). And, although some states and communities have taken steps to improve these practices, see, e.g., Thomas P. Sullivan, Police Experiences with Recording Custodial Interrogations, Special Report of Center on Wrongful Convictions, Northwestern University School of Law, at 4, A1-A10 (2004) (hereinafter "Sullivan Report"), available at http://www/law.northwestern.edu.depts/clinic/wrongful/documents/SullivanReport.pdf (identifying states and departments that have adopted some reforms and the positive results experienced), the majority of departments and jurisdictions continue to eschew specific procedures (in reality, reforms) that would help safeguard against the use of unreliable evidence. Id.

Consider this case as an object lesson on the need for contemporaneous recording of surveillance activities. Here we have an extraordinary set of accusations that are tightly interwoven with indicted allegations against the defendant's own former counsel and staff. Invocation of the Fifth Amendment as to explosive questions directed at police involvement in the corrupt conspiracy lends oblique but highly inconclusive support for the defendant's accusations. So there are two possibilities: (1) the defendant has concocted an exceptional weave of the allegations

contained in the Cicilline/Torres indictment, his own actual experiences, and some newly-minted fabrications into an alleged scheme worthy of a crime novel; or (2) the allegations of the defendant are true. At this stage, there has been no concrete evidence to support a finding that the allegations are true; however (and regardless of how insulted Sergeant Partridge may be by the suggestion) the former seems hard to fathom as well. If the Providence Police had followed the best practices associated with undercover investigations, including documenting the undercover surveillance and the controlled buys and recording their initial interview with co-defendant Isom, there would be no question or doubt about the veracity of the affidavit - and possibly no suppression motion.[8] When defendants face possible sentences of up

---

[8] Lurking in the shadows of this case are other disturbing practices. There is not a single contemporaneous incriminating statement by either defendant (Mason or Isom) that is either recorded or in their own hand. Instead, the only direct evidence linking Mason to the drugs found at 214 Pavilion Avenue (he was not present in the residence immediately before the search) are statements alleged to have been made by Isom during an unrecorded interview in January of 2004 with Partridge. These statements corroborate almost every aspect of the alleged crime but conflict diametrically with Mason's, Mason's father's and Isom's testimony about the use of the 214 Pavilion Avenue residence. In addition, Isom, who on the stand admitted to a number of incriminating actions including drug dealing, testified emphatically that he never made these statements. That perhaps the only direct link between the drugs and Mason could rest on this unrecorded, and disputed, account raises serious concerns. (There was testimony at the hearing of several recorded interviews of Isom in 2006, but at this point the Court is unclear regarding the content of these recordings or the full context of how they were made.) Although at this point the issue is premature, the reliability and propriety of Partridge's witness statement recounting Isom's supposed

to mandatory life in prison, one would think that the quality of the police work would be better. It is for this reason that continued indifference (or resistance) by the Providence Police Department to practices aimed at curing the problems discussed above risks this Court's use of corrective measures. These could take the form, for example, of a finding that an officer's testimony be excluded because its reliability, and therefore probative value, is too low compared to its prejudicial effect, see Fed. R. Evid. 403; or in the form of an instruction to the jury, as part of this Court's usual instruction on how to judge witness credibility, that such undocumented evidence may be disregarded or that the jury may consider the lack of contemporaneous notes or other evidence in determining whether the officer's testimony is credible. Where simple and efficient reforms of the investigative and information-gathering stages offer the possibility of increasing the accuracy of criminal convictions, law enforcement agencies should move swiftly toward their implementation. Failure to take action effectively pits these agencies against the truth-seeking process, imperils an already

---

incriminating statements (and possibly other evidence) may at some future point necessitate a more thorough analysis, especially in light of recent empirical research discussing the nature and effect of unrecorded testimony. See Steven B. Duke, et al., A Picture's Worth a Thousand Words: Conversational versus Eyewitness Testimony in Criminal Convictions, 44 Am. Crim. L. Rev. 1 (2007); Lillquist, Improving Accuracy, 41 U. Rich. L. Rev. at 923; Sullivan Report, at 8; see also Brandon L. Garrett, Judging Innocence, 108 Colum. L. Rev. (forthcoming 2008).

vulnerable criminal justice system and will be met with corrective action by this Court.

It is so Ordered

WESmith

William E. Smith
United States District Judge
Date: 7/26/07